Rebecca A. MACHETTI, a/k/a Rebecca A. Smith, Plaintiff-Appellant,

v.

L. Q. LINAHAN, Warden, Georgia Women's Correctional Institution, Defendant-Appellee.

No. 81–7614.

United States Court of Appeals, Eleventh Circuit.

June 25, 1982.

Stagg, Wildau, Simpson, Hoy & Oakley, Mary Ann B. Oakley, Atlanta, Ga., John Charles Boger, New York City, Anthony Amsterdam, Stanford, Cal., for plaintiff-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for defendant-appellee.

Before INGRAHAM *, HATCHETT and ANDERSON, Circuit Judges.

HATCHETT, Circuit Judge:

This appeal requires a review of the principles of constitutional law governing the fair cross-section requirement of jury composition. We hold that Georgia's jury selection procedure violated appellant's sixth and fourteenth amendment right to an impartial jury trial and reverse and remand to the district court, with directions to issue the writ of habeas corpus.

## I. BACKGROUND

Appellant, Rebecca Machetti, seeks federal habeas corpus relief under 28 U.S.C.A. § 2254 (1977), from two consecutive death sentences. The sentences were imposed by the Superior Court of Bibb County, Georgia, following her February, 1975, jury conviction for two murders. On appeal, the Supreme Court of Georgia affirmed the convictions and sentences and denied her petition for rehearing. *Smith v. State*, 236 Ga. 12, 222 S.E.2d 308, *cert. denied, Smith v. Georgia*, 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed.2d 302 (1976), *rehearing denied*, 429 U.S. 1055, 97 S.Ct. 771, 50 L.Ed.2d 772 (1977). The Bibb County Superior Court denied Machetti's petition for declaratory relief and/or a new presentence hearing and for a stay of execution. After staying her execution pending appeal, the Supreme Court of Georgia denied the appeal and a motion for rehearing. *Smith v. State*, 238 Ga. 655, 235 S.E.2d 375, *cert. denied, Smith v. Georgia*, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159, *rehearing denied*, 434 U.S. 961,

---

* Honorable Joe M. Ingraham, U. S. Circuit Judge    for the Fifth Circuit, sitting by designation.

98 S.Ct. 496, 54 L.Ed.2d 323 (1977). Georgia's high court then issued remittitur to the Bibb County Superior Court, which slated January 20, 1978, as the date of Machetti's execution. She then filed a habeas corpus petition in the Superior Court of Baldwin County, Georgia, which stayed the execution but later denied the petition. In July, 1979, the Georgia Supreme Court denied her application for a certification of probable cause to appeal and denied her motion for reconsideration.

After exhausting her state remedies, Machetti filed a petition for writ of habeas corpus in January, 1978, in the district court for the Middle District of Georgia. That court stayed her execution "until such time as her action has been finally decided in the courts of the United States." After reference to a magistrate, the district court denied Machetti's petition. *Machetti v. Linahan,* 517 F.Supp. 1076 (M.D.Ga.1981).

Machetti was convicted on February 28, 1975, of two counts of murder in the brutal slaying of her ex-husband, Joseph Ronald Akins, and his wife, Juanita. Machetti planned the murders so that her three teenage daughters might receive the benefits of their father's insurance policies. At the sentencing hearing, Machetti's attorney introduced no new evidence but begged the jury to find mitigating factors without suggesting any such circumstances. The jury recommended death on both counts, and the court sentenced Machetti to two consecutive death sentences.

Evidence received at the state habeas hearing showed that the traverse jury list from which Machetti's jury was drawn was composed of only 18% women, despite a 1970 census showing that women comprised 54% of Bibb County's adult population.[1] The grand jury list contained only 12% women. Thus, the absolute disparity between the adult female population of Bibb County and the grand jury list was 42%, and 36% with respect to the traverse jury list.[2] Appellee, L. Q. Linahan, Warden of the Georgia Women's Correctional Institution, concedes the accuracy of these statistics. At the time of jury selection, Ga.Code Ann. § 59–124 (repealed 1975) provided that any woman who did not wish to serve on a jury could "opt-out" merely by sending written notice to the jury commissioners.[3] Potential women jurors in Bibb County automatically received cards allowing them the opportunity to exempt themselves from service.

## II.   ISSUE

We must decide whether appellant was indicted and convicted by juries drawn from a venire which unconstitutionally excluded and underrepresented women.

## III.   JURY COMPOSITION

◼ Machetti's counsel first raised the jury composition issue at the state habeas corpus hearing.[4] She contends that the op-

---

1. Appellant was convicted and sentenced by a twelve-member petit jury which included one woman.

2. Absolute disparity is one method used to calculate disparity. Absolute disparity measures representativeness by the difference between the proportion of the population and the proportion of the underrepresented category in the jury box. Kairys, Kadane & Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists,* 65 Cal.L.Rev. 776, 790 (1977).

3. Ga.Code Ann. § 59–124 (1965) (repealed 1975) provided:

   *Exemption of women who do not desire to serve.*—Any woman of this State who does not desire to serve upon juries shall notify the jury commissioners of the county in which she resides in writing to that effect, and thereupon

the jury commissioners shall not place the name of such woman in the jury box for said county. 1953 Ga.Laws Nov.Sess., pp. 284, 288 (repealed 1975).

4. Generally, a federal court will honor a valid state procedural rule that a defendant's failure to object to a grand or petit jury before or during trial constitutes waiver of that objection as a basis for habeas corpus relief. *Francis v. Henderson,* 425 U.S. 536, 541–42, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976); *Stewart v. Ricketts,* 451 F.Supp. 911, 913–14 (M.D.Ga.1978). A Georgia decisional rule in force at the time of appellant's trial in February and March, 1975, mandated that result. Where, however, the state habeas court entertains the federal constitutional claims on the merits, as in the instant case, the federal habeas court must also adjudicate the merits. *Lefkowitz v. Newsome,* 420

eration of section 59–124 systematically excluded women from the venire; and therefore, she was indicted by a grand jury and convicted by a traverse jury drawn from jury boxes in which women were unfairly underrepresented. Machetti thus contends that the Georgia jury selection procedure deprived her of her right to a fair trial by jury of a representative segment of the community. The district court upheld the selection process.

■ Fundamental to our system of justice is the principle that the sixth amendment grants criminal defendants the right to an impartial jury. This guarantee also embraces a right that grand and petit juries be selected at random so as to represent a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527–30, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975); *United States v. Perez-Hernandez*, 672 F.2d 1380, 1384 (11th Cir. 1982). Also relevant to our inquiry is the notion that

> the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of a difference. Yet a flavor, a distinct quality is lost if either sex is excluded. The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded.

*Ballard v. United States*, 329 U.S. 187, 193–94, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946) (footnote omitted). Moreover, as the Supreme Court more recently stated, "[w]hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972).

U.S. 283, 292 n.9, 95 S.Ct. 886, 891 n.9, 43 L.Ed.2d 196 (1975); *Newman v. Henderson*,

In *Taylor*, the Supreme Court held unconstitutional a state "opt-in" statute which automatically excluded women from the jury list unless they chose to be included by filing a written request for jury service. *Taylor* established that the "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. at 538, 95 S.Ct. at 702, *quoted in Smith v. Balkcom*, 660 F.2d 573 (5th Cir. 1981). In contrast to the statute involved in *Taylor*, Ga.Code Ann. § 59–124 was an "opt-out" statute that automatically included women unless they opted not to serve. The Georgia legislature repealed this statute shortly after the Court decided *Taylor*.

In January, 1979, one year after the filing of Machetti's federal habeas corpus petition, the Supreme Court in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), held unconstitutional a state opt-out statute which also exempted women from jury service on request. In setting forth the elements of a prima facie violation of the fair cross-section requirement, the Court required the defendant to show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668.

In this case, the magistrate suggested that Machetti met the first two criteria required by *Duren*. The magistrate further suggested, however, that Machetti failed to satisfy the third requirement of establishing that the underrepresentation of women was due to their systematic exclusion in the jury selection process. Nevertheless, the magistrate stated that the operation of

539 F.2d 502, 504 (5th Cir. 1976).

Georgia's opt-out statute caused the disproportionate representation of women in Machetti's case. The magistrate suggested that Machetti had failed to satisfy the third prong only because it was not until 1979 that the Supreme Court in *Duren* declared that states could not constitutionally permit all women to opt out from jury duty solely on the basis of sex. He thereby implied that the *Duren* holding that Missouri's opt-out statute constituted "systematic exclusion" was not retroactive. Alternatively, we read this finding to assume that the opt-out statute alone is insufficient prima facie evidence of systematic underrepresentation. The magistrate thus stated that Machetti failed to present any other evidence establishing that the sexual imbalance in Bibb County's venire was due to systematic exclusion of women in the jury selection process.

The district court held that *Duren* could not be applied retroactively on collateral review and that Machetti was therefore not entitled to relief. The court noted that because *Duren* is not applicable to Machetti's collateral attack, it was not necessary for the magistrate to consider whether the circumstances of this case satisfied the *Duren* requirements. Although declining to adopt the magistrate's recommendations on this issue, the district court adopted the magistrate's suggestion that Machetti failed to show that anything other than Georgia's opt-out statute contributed to the underrepresentation of women on the jury list. The court thus implicitly acknowledged that Machetti demonstrated that section 59–124 caused the unconstitutional exclusion of women.

Machetti argues that the district court erred because *Duren*, decided some four years after her trial, must be applied retroactively to her case. In *Lee v. Missouri*, 439

U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979) (per curiam), the Supreme Court held that *Duren* is retroactively applicable to a jury sworn after the decision in *Taylor* because *Duren* did not establish any new principles of constitutional law not already settled by *Taylor*. 439 U.S. at 462, 99 S.Ct. at 711. Appellee concedes that *Lee* requires the retroactive application of *Duren* to this collateral attack. Appellee, however, requests this court to remand the instant case to the district court for consideration of whether the facts herein meet the three-prong test of *Duren*.

We find no just reason for a remand under the present circumstances. Machetti has remained on death row for seven years pending the resolution of these legal proceedings. Appellee has admitted that no questions of fact remain, that no additional relevant factual evidence exists, that no evidence controverts the facts established by Machetti, and that the statistics presented are accurate. The only questions remaining are whether, as a matter of law, the disparity herein violates the sixth amendment and whether the operation of Ga.Code Ann. § 59–124 constituted "systematic exclusion." We thus examine whether, as a matter of law, Machetti established a prima facie fair cross-section claim based on the exclusion of women.

It is undisputed that women are a recognizable, distinct class under the first element of the prima facie case. There is no doubt that the relevant statistics satisfy the second criteria of unfair underrepresentation. The absolute disparity between the percentage of women in the general adult population (54%) and on the 1975 petit jury list (18%) is 36%, whereas a 42% disparity existed with respect to the percentage of women on the grand jury list (12%).[5] The Supreme Court has never fashioned precise

---

5. Although the census figures relied on were five years old at the time of appellant's trial, the Supreme Court has previously accepted six-year-old data as adequate proof of the percentage of the distinctive class in the community. *Duren v. Missouri*, 439 U.S. 357, 365 & n.24, 99 S.Ct. 664, 669 & n.24, 58 L.Ed.2d 579 (1979); *Alexander v. Louisiana*, 405 U.S. 625,

627, 92 S.Ct. 1221, 1223, 31 L.Ed.2d 536 (1972). Furthermore, no evidence exists in the record to indicate that the 1970 census data "significantly distorted" the percentage of women in Bibb County at the time of trial so that the figures were of questionable relevance. *Duren*, 439 U.S. at 357, 99 S.Ct. at 664, 58 L.Ed.2d 579.

mathematical standards for gauging systematic exclusion. *See Alexander v. Louisiana*, 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972). Nevertheless, Supreme Court and Fifth Circuit precedent provide some guidance as to the magnitude of disparity needed to establish a prima facie cross-section claim. The variance here is sufficiently disproportionate to fall within the approximate boundaries delineated in cases holding that the statistical disparities established prima facie violations.[6] *See, e.g., Duren*, 439 U.S. at 360, 99 S.Ct. at 666 (38%); *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (23%); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (14%); *Porter v. Freeman*, 577 F.2d 329 (5th Cir. 1978) (20.4%); *Preston v. Mandeville*, 428 F.2d 1392 (5th Cir. 1970) (13.3%). We hold that appellant's statistical evidence constituted an adequate prima facie showing for the purpose of establishing a fair cross-section violation.

As to the third requirement, the magistrate's recommendation stated that Machetti failed to establish that the underrepresentation of women in the final pool was due to their systematic exclusion in the jury selection process. As noted above, the magistrate impliedly based this finding on the erroneous premise that the declaration in *Duren* that states could not constitutionally permit all women to opt out from jury duty solely on the basis of sex did not apply to this case. The magistrate conducted a *Duren* analysis, yet refused to apply its holding on the ground that *Duren* is not retroactively applicable. The magistrate also distinguished *Taylor*, decided one month prior to appellant's trial, which involved a statute that automatically excluded women

from jury lists because they failed to opt-in whereas this case involved an opt-out statute, as in *Duren*. *Lee*, however, indicates that *Duren* merely clarified *Taylor* and that the constitutional standards enunciated in *Taylor* retroactively apply here, even though *Duren* was decided approximately four years after Machetti's jury trial.

Moreover, the magistrate explicitly found that *"[t]here can be no doubt* that the underrepresentation of women in [Machetti's] case was caused by Ga.Code Ann. § 59–124." In stating that the magistrate need not have decided the constitutionality of the jury composition under *Duren* because it was not retroactively applicable to this collateral attack, the district court never repudiated this proposed finding. In fact, the court implicitly agreed that Machetti met the third-prong in *Duren* by adopting the portion of the magistrate's proposed finding that Machetti "failed to show that anything other than Ga.Code Ann. § 59–124 contributed to the underrepresentation of women in said jury boxes." 519 F.Supp. at 1080. Not only did the district court agree that the disparity resulted solely from the operation of Georgia's opt-out statute, but at oral argument appellee concurred in this view, conceding that no further evidence exists of the cause of the disproportionate representation of women.

We hold that Machetti's proof sufficiently established that the underrepresentation of women resulted from their systematic exclusion in Georgia's jury selection procedure. Her undisputed showing that this significant disparity occurred over a period of twenty months, from February, 1974, through September, 1975, unmistak-

---

**6.** Some of the cases relied on for establishing the benchmark percentages to raise a prima facie claim of discrimination in jury selection involved equal protection challenges. The standard for proving a prima facie violation is virtually identical under both the fair cross-section and equal protection analyses. *United States v. Perez-Hernandez*, 672 F.2d 1380, at 1384 n.5 (11th Cir. Apr. 15, 1982).

Different evidence, however, is relevant to rebutting each challenge. A prima facie case of an equal protection violation may be rebutted by proving an absence of discriminatory

purpose or that such purpose did not have a determinative effect. *Castaneda v. Partida*, 430 U.S. 482, 493–95, 97 S.Ct. 1272, 1279–1280, 51 L.Ed.2d 498 (1977). Discriminatory purpose is irrelevant to a fair cross-section claim which focuses solely on the composition of the venire. Since systematic disproportion alone establishes a prima facie cross-section claim, the rebuttal evidence focuses on the significant state interest which justifies the imbalance. *Duren v. Missouri*, 439 U.S. at 367–68 & n.26, 99 S.Ct. at 670–671 & n.26.

ably indicates that the cause of the imbalance was inherent in the jury selection procedure under Ga.Code Ann. § 59–124. *Duren* established that the existence of an opt-out system, as embodied by statute, in conjunction with the resulting disproportionate and consistent exclusion of women from the final jury pool was prima facie evidence of systematic exclusion of women. 439 U.S. at 366–67, 99 S.Ct. at 669–70. Moreover, appellee introduced no evidence to rebut Machetti's case. We therefore conclude that the Georgia jury-selection system in effect at the time of Machetti's trial deprived her of her sixth and fourteenth amendment right to an impartial jury trial.

Because the jury composition issue is dispositive, we need not reach the additional issues presented.[7]

### IV. CONCLUSION

We do not establish absolute limits on jury composition which would automatically authorize finding a constitutional violation. We merely hold that the percentage of women on the Bibb County jury lists should more closely approximate the percentage of women in the adult community and that 36% and 42% absolute disparities resulting from the operation of Georgia's opt-out statute are unconstitutionally excessive. We therefore reverse and remand to the district court with directions to issue the writ of habeas corpus.

REVERSED AND REMANDED WITH DIRECTIONS.

---

**7.** Machetti has also presented issues involving the effective assistance of counsel at the sentencing phase; the validity of Georgia's death penalty statute as applied to appellant; and whether the death penalty was applied arbitrarily and discriminatorily on the grounds of race and poverty.